2015 UT App 113

## THE UTAH COURT OF APPEALS

ANN GORE,
Petitioner and Appellant,

*v.*

HORACE GRANT,
Respondent and Appellee.

Opinion
No. 20130871-CA
Filed April 30, 2015

Second District Court, Farmington Department
The Honorable John R. Morris
No. 114702018

Lincoln Harris and Zachary E. Peterson, Attorneys
for Appellant

Aaron B. Millar, Attorney for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGES
JOHN A. PEARCE and KATE A. TOOMEY concurred.

ROTH, Judge:

¶1      Ann Gore (Mother) challenges the district court's order modifying the child support agreement she entered into with Horace Grant (Father). First, she contends that modification of the support order is unjust, inappropriate, and not in the best interest of the parties' child. Second, she asserts that the district court did not have the authority to order her to pay Father a $1,700 security deposit. Finally, she appeals from the denial of her requests for attorney fees. We affirm the district court's order on the security deposit but reverse and remand for further proceedings on the other two issues. We decline to award Mother the attorney fees she incurred on appeal.

BACKGROUND

¶2 Mother and Father have one daughter (Daughter), who was born in January 1996. In fall 1997, the parties entered into an agreement governing Father's support obligations to Daughter throughout her minority (the Agreement). The Agreement initially required Father to pay child support in the amount of $3,000 per month. Then, beginning in January 1998, the "monthly amount of Child Support shall be increased by three percent (3%) on January 1 of each calendar year." An attachment to the Agreement details the amount of Father's support obligation, year by year, from 1996 through 2013 when his monthly child support obligation would be $4,812.[1] The parties do not appear to have taken Utah's child support statute into account in establishing these amounts, and, indeed, Father's monthly child support obligation was well above the highest single-child support obligation designated by Utah guidelines at

---

1. The Agreement provides that Father's child support obligation continues until the earliest of the following events: (1) the later of the month of Daughter's eighteenth birthday or her graduation from high school, but not later than the month of her nineteenth birthday; (2) Daughter's marriage; (3) Daughter's leaving home (with certain exceptions); (4) Daughter's enlistment with the armed forces; (5) Daughter's death; (6) Father's death, subject to the terms governing his purchase of life insurance; or (7) Daughter's full-time employment for six consecutive months. By the time of trial, none of the events described in 2 through 7 had occurred, and Daughter was on track to graduate from high school in spring 2014, shortly after her eighteenth birthday. Assuming this was the first of these events to occur, Father's child support obligation would have continued until May or June 2014.

the time.[2] Utah Code Ann. § 78-45-7.14 (Michie 1996) (setting the highest child support obligation amount for one child at $826 per month). In total, the Agreement obligated Father to pay about $850,000 in child support. He also agreed to be responsible for "all reasonable expenses for [Daughter's] medical, dental, orthodontic, psychological or psychiatric care," when those expenses were not covered by insurance. The Agreement further required Father to purchase a residence in Utah for Mother and Daughter to reside in rent-free until the support obligation ended. Father was responsible for "all major structural repairs" to the home, while Mother was to perform "routine maintenance and repair." The Agreement was registered and approved by a Pennsylvania court in December 1997.

¶3     At the time, Father was employed as a professional basketball player for the National Basketball Association (NBA). His NBA career began in 1987 and lasted seventeen seasons (ten before execution of the Agreement and seven after). In 1997, the year the Agreement was executed, Father earned nearly $14.3 million—about $1.19 million per month—from salary alone. Over the next seven seasons, Father earned nearly $27 million more—an average of $3.85 million per year in salary, with his lowest salary for any one year being $583,267. Father retired after the 2004 season and received an additional $2.5 million in deferred compensation. From his retirement through fall 2010, Father remained unemployed and lived solely on his previous earnings. During those years, Father also "lost substantial sums of money from investments and failed business ventures." In late 2010, Father began doing promotional engagements for the NBA. In total, between 1996, the year Daughter was born, and 2011, the year Father moved to modify child support, Father had earned $46.5 million in salary from the NBA. At the time of trial in May 2013, Father was earning $124,000 a year, or $10,352 a

_____

2. Although the Agreement contains a provision that Pennsylvania law is to govern its enforcement, the parties have agreed that Utah law should apply.

month, for his promotional appearances, which took up less than seven weeks per year. Since Daughter's birth, Mother has earned only minimal income from songwriting and a self-owned business. Both parties testified that when they entered the Agreement, they expected that Mother would not seek full-time employment but instead would stay at home to care for Daughter until her majority.

¶4     From 1997 through 2008, Father complied with the Agreement. He purchased a home for Mother and Daughter in Utah and kept current with his child support obligation. In 2009, Father began reducing his monthly support payments. Over the next three years, he typically paid just $3,000 per month, which, in 2009, was about $1,200 less than what he was obligated to pay under the Agreement and by 2011 resulted in a $1,500 monthly deficit. In November 2011, Father filed a petition to modify the Agreement to reduce his monthly child support obligation to $733, an amount Father asserted was consistent with the Utah child support guidelines for persons with the parties' then-current incomes, and to rescind his obligation to provide a home for Mother and Daughter so that he could sell the house to pay off his child support arrearages. Father argued that his circumstances met the threshold requirements for modification under Utah law, both because the child support amount had not been modified within the last three years and because there had been a change of 30% or more in Father's income so as to result in a difference of 15% or more between the support amount due and the amount required by the child support guidelines. *See* Utah Code Ann. § 78B-12-210(8)–(9) (LexisNexis 2012).[3]

¶5     Father's motion for temporary orders reducing his child support payments was denied, but he continued to pay less than

---

3. The child support statutes have been amended since Father filed his petition to modify, but none of the amendments to provisions pertinent to this appeal affect our analysis. We therefore cite the current version of the Utah Code Annotated.

his obligation under the Agreement. With the assistance of the Office of Recovery Services and the contempt power of the district court, Mother eventually recovered the child support arrearages. The district court deemed its contempt order against Father purged after he paid his overdue child support in full.

¶6    Following a one-day trial in May 2013, the district court granted Father's petition to modify. The court concluded that a reduction in child support was warranted because Father had experienced a substantial, non-temporary reduction in annual income from $14 million at the peak of his career in 1997 to $124,000 in 2013. The court found that Father was "no longer capable of working as a professional basketball player due to age and physical injuries" and that without any "discernible specific education, training, or skills qualifying him for employment," Father had no ability to obtain employment other than the kind of promotional appearances he was already doing. The court further found that Father was "accept[ing] and appear[ing] at as many such promotional opportunities as reasonably possible and available" and that he did not have "any other perceptible opportunity to recoup or restore a higher level of income." From these statements, it appears that the district court determined that Father was not voluntarily underemployed. The court also found that Father's income was insufficient "by several thousands of dollars" to cover his household's monthly expenses of $26,000.[4] Ultimately, the district court concluded that because there was a substantial and material change in Father's income that resulted in his child support obligation under the Agreement being approximately 80% higher than his obligation under the Utah child support guidelines, it was appropriate to adjust his child support obligation downward. *See id.* § 78B-12-210(9). Applying the statutory guidelines, the court reduced Father's child support obligation from more than $4,500 per

---

4. Since Daughter's birth, Father has married. At the time of trial, he had four other minor children, including a child with special needs.

month under the Agreement to $1,011 per month.[5] The court made the modification retroactive to December 2011. As a result, the court determined that Father had actually overpaid child support by approximately $24,000 to date. Thus, the court ordered "that the $24,014 overpayment be applied as a credit against [Father's] future monthly child support payments" and authorized Father to "request entry of a judgment against [Mother] in the amount [of] his overpayment" after the child support obligation terminated.

¶7     With respect to Father's request that he be released from his obligation to provide Mother and Daughter with a home, the court concluded that "it is fair and equitable that the requirements of the [Agreement] pertaining to the Utah House continue" until the termination of child support. The court, however, found merit in Father's claim that Mother had failed to maintain the home as required by the Agreement. As a consequence, it ordered Mother to pay Father "a security deposit for the Utah House in the amount of $1,700, the equivalent of one month's rent." This deposit was to be "applied to the reasonable costs of cleaning and repairing the Utah House upon its vacation by [Mother] and/or [Daughter]" with "[a]ny unused portion" to be "refunded to [Mother]."

¶8     Finally, the court denied Mother's requests for attorney fees. It reasoned that Father, not Mother, was the prevailing party and that Mother had not demonstrated a need for fees and costs. The court also determined that there was no basis for an "imposition of sanctions against [Father,] due to the purging of his contempt."

---

5. This figure was calculated by applying the statutory guidelines to Father's $10,352 in monthly income and Mother's imputed monthly income of $1,257. Mother stipulated to the imputation of income.

¶9     Mother appeals from the district court's decisions reducing child support, ordering that she pay Father a security deposit to live in the Utah home, and denying her requests for attorney fees.

ISSUES AND STANDARDS OF REVIEW

¶10     Mother challenges the district court's decision to modify Father's child support obligations. Ordinarily, "[i]n reviewing child . . . support proceedings, we accord substantial deference to the trial court's findings and give it considerable latitude in fashioning the appropriate relief." *Diener v. Diener*, 2004 UT App 314, ¶ 4, 98 P.3d 1178 (omission in original) (citation and internal quotation marks omitted). But because the district court was considering child support in the context of a previously stipulated child support arrangement, we also review the district court's interpretation and application of the Agreement for correctness. *See Cantrell v. Cantrell*, 2013 UT App 296, ¶ 10, 323 P.3d 586 (noting that appellate courts "review the trial court's legal determinations regarding . . . entitlement to child support modification for correctness" (citation and internal quotation marks omitted)).

¶11     Mother also challenges the denial of her requests for attorney fees pursuant to Utah Code section 30-3-3. The decision to award or deny attorney fees in domestic cases is within the district court's sound discretion, and we will disturb the decision only if the district court abuses that discretion. *Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 49, 176 P.3d 476.

ANALYSIS

I. Child Support Modification

¶12     This case is unusual. Early in Daughter's life, the parties entered into a child support agreement that would be in effect until Daughter reached majority. The parties agreed to child

support payments that were not calculated from any applicable support guidelines but would increase from an initial $3,000 per month to nearly $5,000 per month over the life of the Agreement. And they entered into the Agreement with an understanding that Father would very likely not be able to continue working as an NBA player during the Agreement's entire term. Yet now, after Father's income has, as expected, decreased markedly, he seeks to reduce his child support payment to fit within the guidelines. We conclude that the district court erred in granting Father's modification request without fully considering the extraordinary circumstances of this case.

¶13 Contracts relating to domestic arrangements, created without judicial intervention, can be enforceable. *Cf. Levin v. Carlton*, 2009 UT App 170, ¶ 9, 213 P.3d 884 ("[Pre]nuptial agreements are to be construed and treated as are contracts in general. They are in no way different from any other ordinary contract." (alteration in original) (citation and internal quotation marks omitted)). The enforceability of a contract governing a child's support, however, is limited. *See, e.g.*, Utah Code Ann. § 30-8-4(2) (LexisNexis 2013) (prohibiting premarital agreements from governing child support). This is because the legislature has set the presumptive amount of child support necessary to meet a child's needs, based on the parents' incomes (the guidelines). *Id.* §§ 78B-12-205(1), -210(2) (LexisNexis 2012). The legislature has further required that any deviation from the guidelines be justified by a finding that support at the guidelines amount would be "unjust, inappropriate, or not in the best interest of a child." *Id.* § 78B-12-210(3). Parents, however, may enter into an agreement that requires one parent "to pay child support *in excess* of the guidelines even if the trial court does not make a specific finding that such a deviation is warranted . . . [b]ecause an increase in ordered child support does not negatively implicate a child's best interest in the obvious way that a decrease in child support would." *Cantrell*, 2013 UT App 296, ¶ 14 (citation and internal quotation marks omitted); *see also* Utah Code Ann. § 78B-12-201(4) ("A stipulated amount for child support . . . is adequate under the guidelines if the stipulated

child support amount . . . equals or exceeds the base child support award required by the guidelines.").

¶14   There is no dispute that the parties' Agreement satisfied these conditions and was an enforceable child support order.[6] When there is a support order in effect, "[p]rospective support shall be [ordered in an amount] equal to the amount granted by [the] court order." Utah Code Ann. § 78B-12-202(1)(a) (LexisNexis 2012). Further, if the child support order contains a "stipulated provision for the automatic adjustment for prospective support," then support shall be adjusted in accordance with the order, provided that the automatic adjustment provision "is clear and unambiguous," "is self-executing," "provides for support which equals or exceeds the base child support award required by the guidelines," and "does not allow a decrease in support as a result of the obligor's voluntary reduction of income." *Id.* § 78B-12-202(1). Deviation from the prior order is permitted, however, when there has been a substantial change of circumstances. *Id.* A substantial change in circumstances sufficient to warrant modification occurs if one of the parent's incomes changes "30% or more" or there are "material changes in the employment potential and ability of a parent to earn" that cause "a difference of 15% or more between the payor's [original] support amount and the payor's support amount that would be required under the guidelines" using the new income. *Id.* § 78B-12-210(9)(b)–(c). When such a substantial

---

6. Although the parties entered the Agreement on their own accord, they did register it with a Pennsylvania court, which "approved" it. Thus, both the parties and the district court treated the Agreement as an order of the court that is subject to the modification provisions of the Utah child support statutes. For purposes of appeal, we accept this characterization and do not address the issue of whether an above-guidelines agreement reached outside the judicial process, such as the one here appears to be, is governed by the modification provisions of the child support statutes.

change of circumstances occurs, it is presumed that child support will be modified to the amount set forth in the guidelines. *Id.* §§ 78B-12-202(2), -210(2)(a). That presumption is rebutted, however, if the district court determines that "complying with a provision of the guidelines or ordering an award amount resulting from use of the guidelines would be unjust, inappropriate, or not in the best interest of a child in a particular case." *Id.* § 78B-12-210(2)(a), (3). Should the court determine that the guidelines amount has been rebutted, the court shall make a finding to that effect. *Id.* § 78B-12-210(3). It then must devise a support order "after considering all relevant factors," including the following non-exclusive list:

> (a) the standard of living and situation of the parties;
> (b) the relative wealth and income of the parties;
> (c) the ability of the obligor to earn;
> (d) the ability of the obligee to earn;
> (e) the ability of an incapacitated adult child to earn, or other benefits received by the adult child or on the adult child's behalf including Supplemental Security Income;
> (f) the needs of the obligee, the obligor, and the child;
> (g) the ages of the parties; and
> (h) the responsibilities of the obligor and the obligee for the support of others.

*Id.* § 78B-12-202(3).

¶15 Father filed his petition to modify the Agreement's child support obligations on the ground that he had suffered a substantial change in circumstances due to a significant loss of income following the termination of his NBA career. Father requested that the district court reduce his child support obligation from the agreed-upon amounts to a guidelines amount in line with his current salary. Mother did not dispute that Father's financial circumstances had substantially changed. She contended, however, that in assessing whether a downward

departure from the amount of support contemplated by the Agreement to the amount established by the guidelines was warranted, the court could not focus solely on Father's current income. Rather, she argued, in light of the circumstances surrounding the execution of the Agreement, Father's investment and expenditure of his significant accumulated income as well as Father's ongoing standard of living, the district court ought to have determined that the presumption that the guidelines apply had been rebutted. She pointed to the fact that since Daughter's birth, Father had earned over $46.5 million from NBA salary alone. And since 2010, his primary source of income was from limited promotional appearances—in 2013, the year of trial, Father earned $124,000 for less than seven weeks of employment. She further argued that at the time of the petition, Father continued to live a relatively lavish lifestyle, with his household expenses totaling $26,000 per month. Yet Father based his modification petition on his insolvency, contending that due to failed business investments, he lacked any significant income or unencumbered assets with which he could uphold his end of the bargain memorialized in the Agreement.

¶16 Moreover, before the modification petition, Father's child support had never been governed by the child support guidelines. Instead, the parties had agreed, in writing, to specific amounts of child support to be paid over the course of Daughter's minority notwithstanding Father's actual income. At trial, Mother testified that she had agreed to the amounts set in the Agreement because she wanted to "insure a stable income" that would allow her "to stay home with [Daughter]," as both parties agreed she should. The parties were aware that Father was unlikely to continue his NBA career for the Agreement's entire duration, but given the magnitude of his income in the meantime, they expected that he would preserve sufficient income or assets to meet that obligation, without imposing any significant impact on his lifestyle, much less any hardship. Yet once the Agreement neared its term and the highest obligations kicked in (over $4,500 per month), Father sought to modify the arrangement to reduce his child support obligation in proportion

only to his current income. Father asked that the court make such an adjustment based on his decline in salary only, without consideration of his actual wealth and other assets and despite the fact that he received the benefit of lower payments during the time that he had the greatest ability to pay.

¶17    The court accepted Father's invitation. After finding that Father's income had significantly and permanently decreased and accepting his representations that he had "lost substantial sums of" his accumulated wealth, the court concluded that a decrease in child support to the guidelines amount was appropriate because Mother had "offered no direct evidence that a reduction . . . to an amount consistent with the Utah child support guidelines would have an actual adverse effect on the financial needs or wellbeing of [Daughter]." The court then reduced Father's monthly support obligation to the guidelines amount of $1,011, which is substantially less than what Father had agreed to pay to meet what the parties must have expected to be increasing expenses as Daughter grew older. Under the totality of these circumstances, Mother reasons, "ordering an award amount resulting from use of the guidelines would be unjust, inappropriate, or not in the best interest of" Daughter. *See id.* § 78B-12-210(2)(a), (3).

¶18    We agree with Mother that in modifying child support in accordance with the guidelines, the district court failed to adequately take into account the totality of the evidence pertinent to whether the presumption in favor of the guidelines had been rebutted, focusing narrowly on whether the requested reduction of child support "would have an actual adverse effect on the financial needs or wellbeing of [Daughter]," instead of taking a broader look at whether the result would have been otherwise unjust or inappropriate under all the circumstances. Although the court found that Father had lost a substantial amount of his wealth, the court also found that Father had $375,000 in savings, income from a $205,000 installment sale contract and $1 million judgment, and $68,000 in other assets. Yet, rather than considering Father's ability to meet his agreed-upon child support obligation through both his salary and his

other remaining assets, the court seems to have compared only Father's current earnings and his income history in determining that the presumption had not been rebutted.[7] But in light of the evidence proffered by Mother in the context of the unusual circumstances of this case, a reduction of child support to track the guidelines would be appropriate only after a more careful consideration of whether the presumption that the guidelines applied had been rebutted. And such a determination requires the court to consider the Agreement's history and Father's broader economic circumstances, not simply his current income, in order to fairly determine whether application of the guidelines would be "unjust, inappropriate, or not in [Daughter's] best interest." *See id.* § 78B-12-210(3). This case did not start as a guidelines case; rather its genesis was in circumstances far distant from what appears to have been contemplated by the legislature in establishing the guidelines. And the district court seems not to have taken this and other circumstances fully into account in the decision it made here.

¶19    We therefore remand for the district court to specifically address the question of whether the guidelines have been rebutted and then to establish the appropriate child support amount, either in accordance with the guidelines if the presumption has not been rebutted or after consideration of the

---

7. In assessing whether the presumption had been rebutted, the district court also considered Mother's earnings, finding that "since the entry of the Pennsylvania Order," Mother has "relied upon [Father's] monthly child support payments and taken only perfunctory action to contribute to the economic support of [Daughter]." Although the court could certainly take this into account as part of its overall assessment of the presumption, doing so without considering the fact that the parties had undisputedly agreed that this was the intent of the Agreement seems to unduly weigh the scale in favor of the presumption, at least when considered only in the context of Father's current income.

statutory factors if the presumption has been rebutted. In remanding, we express no opinion about whether the presumption has or has not been rebutted.[8] Indeed, despite the information cited in this opinion that seems to support a finding that the guidelines have been rebutted, there may well be other circumstances that warrant their application. *See Busche v. Busche*, 2012 UT App 16, ¶ 17 & n.8, 272 P.3d 748 (explaining, in the context of assessing the appropriateness of modification of support when one parent claimed that the other was voluntarily underemployed, that district courts must take into account the realities of the parents' financial situations, even under circumstances where one parent or both should have been able to fulfill the original support obligation by acting more prudently).

## II. Security Deposit

¶20    Next, Mother challenges the district court's order that she pay a $1,700 security deposit to remain in the home that Father was contractually obligated to provide for Daughter. We conclude that such an order fell within the district court's discretion to fashion appropriate child support orders. *See Diener v. Diener*, 2004 UT App 314, ¶ 4, 98 P.3d 1178.

¶21    Under the Agreement, Father's child support obligation included a requirement that he purchase a home for Mother and

---

8. We note that the statutory factors for an extra-guidelines award seem to echo the unusual circumstances of this case, where there is a substantial disproportion between the parties' relative "standard of living and situation," "wealth," "ability . . . to earn," "needs," and "responsibilities . . . for the support of others." Utah Code Ann. § 78B-12-202(3) (LexisNexis 2012). But the factors do not suggest a decision in favor of one outcome or another; rather, if the presumption is rebutted, the factors would have to be weighed and balanced to arrive at an equitable outcome.

Daughter to reside in rent-free during the Agreement's term.[9] When Father moved to modify his child support obligation, he also requested that the court eliminate this requirement. As part of his request, Father asked the court to order Mother to pay a $5,000 security deposit to cover the costs of any reasonable repairs that he would have to make after Mother and Daughter vacated the home. Father premised his request on the fact that a domestic relations commissioner had previously found that Mother had not been maintaining the home, as was required by the Agreement, and had ordered her to undertake certain repairs to Father's satisfaction. Father also cited the fact that he had difficulty in obtaining access to the home to ensure that Mother had adequately complied with the commissioner's repair order.

¶22　The district court denied Father's request to eliminate the requirement that he provide a rent-free home for Daughter because requiring Daughter to move after nearly seventeen years would be "unnecessarily disruptive" and "would be neither equitable nor just, nor in the child's best interests." The court, however, did order Mother to pay a security deposit in the amount of $1,700, the "equivalent of one month's rent," which was to be "applied to the reasonable costs of cleaning and repairing the Utah House upon its vacation" with "[a]ny unused portion . . . [to be] refunded" to Mother. Imposition of a reasonable security deposit seems to be an appropriate response to Father's concern, validated by the commissioner's findings, that there would likely be some need for repairs to the home at the end of the Agreement's term. That the court acted within its discretion seems particularly true where the Agreement itself does not provide Father with the typical remedies available to a landlord should the tenant breach his or her maintenance obligations.

---

9. The parties and the district court treated the requirement that Father provide a home for Daughter as part of his child support obligation. We accept that characterization.

¶23 Mother nevertheless contends that imposition of the security deposit, no matter how reasonable its amount, was an abuse of discretion because she did not have adequate resources with which to pay $1,700. In support of her position, Mother cites the district court's findings that she had nearly $5,200 in monthly expenses but only $200 in income (other than from child support). Mother's description of the court's findings, however, is incomplete. First, the district court expressed doubt about the reasonableness of Mother's claimed expenses, stating, "[Mother] claims combined monthly expenses totaling $5,129.41, despite having no rental or mortgage expense and only a two-person household." Second, the court, with Mother's stipulation, imputed income to her in the amount of the "federal monthly minimum wage of $1,257." The court further found that Mother has "over $31,000 in bank accounts," although it also found that she had significant credit card debt. Mother has neither challenged these findings nor made any attempt to analyze her ability to pay using the figures actually attributed to her by the district court. We therefore do not further address her claim that she could not afford the $1,700 security deposit. Because we conclude that the district court acted within its discretion "in fashioning the appropriate relief" for Father's concern that his compliance with the obligation to provide housing for Daughter might cause him greater expense, *see Diener*, 2004 UT App 314, ¶ 4 (citation and internal quotation marks omitted), we affirm the order requiring Mother to pay a $1,700 security deposit.

### III. Attorney Fees

¶24 Finally, Mother claims that the district court abused its discretion when it denied her requests for attorney fees. Mother also requests an award of her attorney fees incurred on appeal. We reverse the district court's denial of attorney fees and remand for further consideration. However, we deny Mother's request for attorney fees on appeal because she has not asserted a basis or provided any reasoned analysis for awarding them.

A.      Attorney Fees Incurred in the District Court

¶25   Mother requested that the district court award her attorney fees pursuant to Utah Code section 30-3-3 to reimburse her for the fees she incurred both to enforce the child support order through the contempt proceedings and to defend against Father's modification petition. *See* Utah Code Ann. § 30-3-3(1), (2) (LexisNexis 2013) (authorizing a district court to award attorney fees "in any action to establish [or enforce] an order of . . . child support"). "Utah Code section 30-3-3 creates two classes of attorney fees—those incurred in *establishing* court orders and those incurred in *enforcing* court orders . . . ." *Connell v. Connell*, 2010 UT App 139, ¶ 28, 233 P.3d 836. When considering a fee request in the context of an order-establishment proceeding, the court must assess the usual factors of "(1) the receiving [party's] financial need, (2) the payor [party's] ability to pay, and (3) the reasonableness of the requested fees." *Id.* ¶ 27. When a fee request is made in an order-enforcement proceeding, however, "[t]he guiding factor . . . is whether the party seeking an award of fees substantially prevailed on the claim." *Id.* ¶ 28. In assessing a request for enforcement fees, the district court "may disregard the financial need of the moving party." *Id.* (citation and internal quotation marks omitted). The reason for the distinction is that the legislature had a different purpose in authorizing the district court to award each class of fees: an award of fees incurred in an establishment proceeding "enable[s] a party to prosecute or defend the action," while an award of fees incurred in an enforcement proceeding "allow[s] the moving party to collect fees unnecessarily incurred due to the other party's recalcitrance." *Id.* ¶¶ 29–30.

¶26   The district court denied Mother's requests for attorney fees because it found that she "is not the prevailing party" and "has failed to sufficiently demonstrate a need for an award of fees and costs." In making these findings, the court did not appear to distinguish between fees requested for the enforcement action (the contempt proceedings) and the fees requested for the establishment action (the modification

proceedings). Mother contends that the district court abused its discretion in denying her requests for attorney fees because the denials were based on findings that are not supported by the record. As we explain below, we remand for the district court to reconsider its denial of Mother's requests for attorney fees.

1.      Contempt Proceedings

¶27     Mother initiated an enforcement action when she sought to collect past-due child support and payment for Daughter's dental bill. *Cf. Busche v. Busche*, 2012 UT App 16, ¶ 28, 272 P.3d 748 (observing that an order to show cause hearing was a child support enforcement action). Thus, the guiding factor for the district court in determining whether it ought to award Mother the attorney fees she incurred in the contempt proceedings is whether Mother prevailed upon her claims. *Connell*, 2010 UT App 139, ¶ 28. The district court found that Mother "is not the prevailing party." This finding is erroneous.

¶28     In early 2012, Mother moved for a judgment against Father for non-payment of nearly $50,000 in child support obligations from January 2009 to December 2011 and for failure to pay Daughter's $1,071 dental bill. She also sought to have Father held in contempt for his noncompliance. In March 2012, the district court entered judgment for Mother in the amount of $48,652 for Father's child support arrearages[10] and set the issue of Father's contempt for hearing. The district court subsequently found Father to be in contempt for failing to pay his past-due child support. About this same time, the commissioner considered Father's failure to pay Daughter's dental bill.

_____

10. Mother's judgment was later reduced by $3,525 when the district court retroactively modified Father's child support as of December 2011. This reduction does not warrant a departure from our conclusion that Mother prevailed in the enforcement action.

Although the commissioner declined to certify the issue of contempt, he entered a judgment against Father for the $1,071 bill. Thus, Mother clearly prevailed in the proceedings to enforce the Agreement.[11] *See Olsen v. Lund*, 2010 UT App 353, ¶ 7, 246 P.3d 521 (explaining that the prevailing party is "the party in whose favor the net judgment is entered" (citation and internal quotation marks omitted)).

¶29 The district court, however, determined that Mother had not prevailed when assessing her request for attorney fees. While the district court's determination is correct with respect to the modification proceedings that established a lower child support obligation for Father, it is not accurate with regard to the contempt proceedings. It appears that the court failed to take into account the distinction between the two types of proceedings but rather considered only which party was the "comparative victor[]" overall. *See id.* ¶ 12 (citation and internal quotation marks omitted). But these two proceedings are distinct both in subject matter and in the statutory basis for a fee award and, as a result, should be treated by the court as legally distinct in determining whether to award attorney fees.

¶30 Nevertheless, the fact that Mother prevailed in the contempt proceedings does not mean that she is automatically

---

11. The district court's contempt order provided that Father could avoid the consequences of its contempt finding—a $1,000 fine and thirty days in jail—if he came "current on child support for the current year within thirty days" and paid "an additional $2,000 per month beginning May of 2012" until he had paid off his arrearages. By the time of trial, Father had paid the child support arrearages and was current on his child support obligations. As a result, the district court concluded that he had "purged his contempt." Father's resulting compliance with the court order reinforces the conclusion that Mother prevailed in enforcing the Agreement's child support and dental coverage obligations.

entitled to attorney fees. Rather, an award of attorney fees in a child support enforcement case is generally left to the sound discretion of the district court. *See Connell v. Connell*, 2010 UT App 139, ¶ 27, 233 P.3d 836; *see also* Utah Code Ann. § 30-3-3(2) (LexisNexis 2013) (permitting a district court to award attorney fees to the party who substantially prevails but giving the district court discretion to "award no fees or limited fees against a party if the court finds the party is impecunious" or otherwise "enters in the record the reason for not awarding fees"). It appears that the commissioner, with the district court's approval, has already denied any fees related to the dental bill judgment in Mother's favor on the basis that it was equitable for the parties to bear their own fees. Thus, we remand for the district court to determine whether an award of attorney fees for enforcing the child support obligation is appropriate, given that Mother was the prevailing party in the contempt proceedings.

2.    Modification Proceedings

¶31   The modification proceedings, on the other hand, involved a request to modify child support, in other words, to establish a different support obligation. *See Busche*, 2012 UT App 16, ¶ 28 (noting that a modification proceeding is a child support establishment proceeding). Thus, in deciding whether to award Mother her attorney fees, the district court was required to assess Mother's need for money to pay fees, Father's ability to pay fees, and the reasonableness of the amount of fees requested. *See Connell*, 2010 UT App 139, ¶ 28. The district court found that Mother had "failed to sufficiently demonstrate a need for an award of fees and costs."[12] We do not address whether this finding is supported by the evidence but rather simply remand for reconsideration because the district court did not distinguish between the two types of fees at issue here and the court's view of the merits of Mother's request may be affected by its

---

12. The district court did not make findings on the other two factors.

reconsideration of the child support modification issue in any event. In doing so, we express no opinion on the merits of Mother's request.

B.     Attorney Fees Incurred on Appeal

¶32     Finally, Mother requests that we award her the attorney fees she incurred on appeal. "Generally, when the trial court awards fees in a domestic action to the party who then substantially prevails on appeal, fees will also be awarded to that party on appeal." *Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 52, 176 P.3d 476 (citation and internal quotation marks omitted). Although Mother has prevailed on appeal in the sense that she has successfully challenged the district court's finding that she was not the prevailing party in the contempt proceedings and has obtained a rehearing of the modification proceedings, she has not yet received an award of attorney fees below, nor is such an award guaranteed on remand. Under these circumstances, Mother's conclusory request, unsupported by any analysis or legal authority, that we "remand for an award of attorney fees for both the district court and appellate proceedings" does not provide a sufficient basis to warrant an award of appellate attorney fees. *See* Utah R. App. P. 24(a)(9) (requiring a party requesting attorney fees on appeal to "state the request explicitly and set forth the legal basis for such an award"). Accordingly, we deny her request.

CONCLUSION

¶33     We affirm the district court's order that Mother pay Father a security deposit to reside in the home. We reverse the district court's decision to modify the Agreement and its decisions to deny attorney fees and remand for further consideration of those issues. We deny Mother's request for attorney fees incurred on appeal.

———————