**2019 UT App 195**

## THE UTAH COURT OF APPEALS

CAROL BURGGRAAF,
Appellee,
*v.*
BRIAN JOSEPH BURGGRAAF,
Appellant.

Opinion
No. 20180405-CA
Filed November 29, 2019

Second District Court, Ogden Department
The Honorable Camille L. Neider
No. 154902227

Julie J. Nelson, Erin B. Hull, and Benjamin G. Larsen,
Attorneys for Appellant

Suzanne Marelius, Attorney for Appellee

JUDGE KATE APPLEBY authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

APPLEBY, Judge:

¶1  In April 2018, Brian Joseph Burggraaf and Carol Burggraaf divorced after nearly twenty-two years of marriage. Following a bench trial, the district court entered findings of fact and conclusions of law and granted a decree of divorce. Joseph[1] contends the court erred when it (1) imputed income to him for the purpose of calculating child support and alimony, (2) determined he owed unpaid child support, (3) found the

---

1. Because both parties share a last name, we use their given names "with no disrespect intended by the apparent informality." *Smith v. Smith*, 2017 UT App 40, ¶ 2 n.1, 392 P.3d 985.

majority of his student loans to be separate debt, and (4) set his budget for the purpose of calculating alimony. Joseph also contends the court's overall property distribution was inequitable. We affirm in large part but vacate the modest alimony award.

BACKGROUND[2]

*Education and Work History*

¶2 Joseph and Carol married and had five children. A few years into the marriage, Joseph decided to pursue a medical degree and the family moved to Colorado for his studies. Joseph has a learning disability that hinders his ability to "process[] new information," and as a result he struggled academically during medical school. With testing accommodations, he was able to pass the first two medical board exams, but only after attending a tutoring program in Illinois. The parties agree that it cost approximately $4,000 each time Joseph attended the program, but they disagree as to whether the medical school or Joseph's student loans paid for it, though Joseph offered no evidence to show the medical school had paid for the program. Joseph graduated with a medical degree and approximately $260,000 in student loan debt.

¶3 After graduating from medical school, Joseph did not obtain a full-time residency but was able to secure a temporary position in the state of Washington. He was not offered a

_____

2. "On appeal from a bench trial, we view the evidence in a light most favorable to the [district] court's findings, and therefore recite the facts consistent with that standard" and "present conflicting evidence to the extent necessary to clarify the issues raised on appeal." *Kidd v. Kidd*, 2014 UT App 26, n.1, 321 P.3d 200 (quotation simplified).

permanent position there and was unemployed for one year. Joseph returned to the Illinois tutoring program as a preemptive measure for the third and final board exam, passage of which is required to become a licensed practicing physician. Although he finished the tutoring program, Joseph did not immediately take the exam. Instead, he obtained another temporary residency in Georgia but was fired after thirteen months. Joseph then took the final board exam and failed. He returned to Illinois for the tutoring program but ultimately did not retake the exam because he decided he "would not likely pass." After considering these facts, the district court determined Joseph "chose to abandon his pursuit of work in the medical field."

¶4     During Joseph's medical school and residency pursuits, Carol was "mostly a stay at home mother" who occasionally taught piano lessons to earn extra money. At trial she testified that the family's frequent moves made it difficult for her to maintain a consistent client base for these lessons. While Joseph was in medical school and residency, the family received government and charitable assistance to make ends meet. At the time of trial, Carol earned approximately $1,100 per month.

¶5     Since deciding to forgo becoming a licensed physician, Joseph's employment history was sporadic. He was a substitute teacher earning $82 per day for a short time before starting his own business funded by a $16,500 loan from his father. The business failed after a few months; Joseph recouped the investment, but he earned nothing more. He then took seasonal contracting work, earning between $1,863 and $2,900 per month for six months. After that, he sold insurance for a few months; in his "best month" he earned about $900. At the time of trial, Joseph was earning $1,200 per month at a river "tubing" business, working ten-to-twenty hours per week during the off-season and seventy-to-eighty hours per week in the summer. Joseph testified that he also was attending school in pursuit of a master's degree, which put his student loans in deferment.

*The Divorce*

¶6    The parties separated following a domestic violence incident, and Carol was granted temporary custody of their five children. Joseph later pled no contest to the criminal charges and was convicted of a class B misdemeanor.[3] Approximately six months later, Joseph began paying Carol $200 per month for child support, which he calculated on his own without a court order.

¶7    The divorce was finalized three years after the date of separation following a four-day bench trial. After hearing evidence from both parties, the court determined Joseph was willfully underemployed and imputed his income for the purposes of calculating child support and alimony, granted Joseph and Carol joint physical and joint legal custody of the children, determined Joseph owed Carol unpaid child support, found the majority of Joseph's student loans to be separate debt, and awarded Carol alimony. The court also distributed the marital property and debts, accounting for offsets and credits as necessary.

*Income Imputation*

¶8    Both parties asked the district court to impute the other's income because each claimed the other was willfully underemployed and his or her claimed income did not reflect his or her employment potential.

¶9    The court determined Carol was not willfully underemployed and, using her previous three years' tax returns, imputed to her a monthly salary of $1,750. But the court found Joseph was willfully underemployed and had "substantially

---

3. Joseph denies the allegation and claims the conviction prevents him from obtaining meaningful employment.

undermined the financial stability" of the family. The court noted Joseph's history of being secretive about his finances and said he had "lacked candor with [Carol] and the Court." The court found it significant that Joseph did not "pursue[] employment associated with his medical degree" and that his "choices of employment [were] significantly different, without believable explanation, depending on if the parties were together or separated." Further, Joseph did not provide the court with information about "all of his financial accounts" and "ha[d] been untruthful about the true nature of his income and assets." Joseph also failed to provide evidence of "his current paycheck being deposited."

¶10    Although Carol asked the court to impute a medical doctor's salary to Joseph, the court declined to do so, as it was too speculative. Because neither party presented evidence to show what a person in Joseph's situation—holding a medical degree but not being a licensed physician—could earn in the local area, the court was left to cobble together an average monthly income using Joseph's earnings when he owned his business and did contracting work as "the most credible evidence of [his] potential income." The court found it "equitable and just to impute" to Joseph a monthly income of $3,421.

*Child Support and Child Custody*

¶11    The district court granted Carol and Joseph joint physical and joint legal custody of their five children. In its order, the court gave the two eldest children "broad discretion to exercise parent time in whatever amount they fe[lt was] appropriate with either parent," although they were "not obligated to exercise said parent time." The court also recommended the three eldest children "participate in reunification therapy" with Joseph, which they "may attend if they so desire but will not be forced." With regard to the three youngest children, the court gave

Joseph overnight parent-time every other weekend and one weeknight every other week and, during the other weeks, one non-overnight midweek visit. Carol was given "all other regular parent time not awarded to" Joseph, with the parties sharing statutorily prescribed holiday time and summer vacation.

¶12   In determining Joseph's child support obligation, the court acknowledged the parties stipulated to joint physical custody but noted Carol was in reality the "primary custodial parent" and thus "responsible for all of the day-to-day out-of-pocket expenses for the children while they are with [her]." Joseph also testified he never had more than every other weekend with the two eldest children and Carol testified their middle child "often chose[] to do other things" than stay with him. Although Joseph calculated his child support obligation on his own to arrive at his $200 monthly figure, he failed to take into account the fact that only the two youngest children were with him for 142 nights, or more than thirty percent of the year.[4] Because of this, the court used the sole custody worksheet to determine Joseph's child support obligation.

¶13   The court gave Joseph credit for paying $200 per month (a total of $4,847.50) but, because it decided Joseph's child support obligation was actually $1,138 per month during that period, he owed Carol more than $40,000 in unpaid child support.

*Student Loans*

¶14   At trial, Joseph argued his student loans, which were "in excess of $260,000," should be considered a marital debt. He

---

4. "'Joint physical custody' means the child stays with each parent overnight for more than 30% of the year, and both parents contribute to the expenses of the child in addition to paying child support." Utah Code Ann. § 78B-12-102(15) (LexisNexis 2018).

claimed only $59,551.34 of the money was used for medical school tuition and the rest was used for family expenses. He testified that the medical school paid for all books, laboratory coats, and equipment, such as stethoscopes. Carol denied this and testified that not only was the family using government assistance and charitable donations to pay their living expenses, but Joseph kept the money from his student loans in a separate account to which Carol had no access. Evidence also showed Joseph incurred "extra costs" such as "equipment, study aids, tutoring resources and [the Illinois] preparation course based on his perceived need due to his processing/learning disorder that were above and beyond the tuition expenses." To dispute this, Joseph offered into evidence bank statements from two months showing a total of $3,308 in student loan money was deposited into the couple's joint account, which was used for "living expenses, to pay the rent . . . utility bills . . . [and] kid expenses."

¶15　The district court determined Joseph's student loan debt was his separate obligation, with the exception of the $3,308 deposit into the joint checking account. In making this determination, the court found Joseph was not "credible in his representation that of $260,000 in student loans, only 25% was needed for actual school related costs." The court noted Joseph "is the only one that may ever receive any benefit of his medical degree if he ever chooses to utilize it" and that he "solely decided to abandon his plans to be a licensed medical doctor." Because of this, the court concluded "it would be unjust to require" Carol to share in the responsibility for the student loans.

*Alimony*

¶16　In preparation for trial, Carol and Joseph each submitted to the court estimated monthly budgets. Joseph's total monthly budget was $4,706 and included a line item for "education (self)"

of $1,500. Carol's monthly budget was $5,476, including a line item for "extra-curricular activities (children)" of $850.

¶17   Each testified extensively about their monthly expenses. Joseph did not produce documentation to support his contention that he paid $1,500 per month for his current educational pursuits. But he testified that his medical school student loans were in deferment because he was attending school. The parties each testified that, during the marriage, they struggled financially. At one time, they lived with Joseph's parents, and they often received institutional charity, government aid, and help from their families.

¶18   In its findings of fact and conclusions of law, the district court adjusted Carol's budget and removed anything it found to be "discretionary and not reasonable necessary expenses," including the children's extra-curricular activities. The court determined Carol's reasonable monthly budget to be $2,855, which, after calculating child support and her imputed income, left "her with a shortfall of $86 per month."

¶19   The court declined to give Joseph a line item for his student loans because they were in deferment and he was not making payments on them. He also did not get a line item for his current educational expenses. The court said it omitted these items from Joseph's submitted budget as discretionary and unnecessary "[b]ased on the testimony of the parties and the verifying documents presented at trial," noting "none of [Joseph's] documents reflect any student-aid, loans[,] or other assistance or expenses related to his current course of study" and Joseph "claimed to be paying approximately $1,500 per month in educational expenses for himself . . . with no documentation."

¶20   In determining Joseph owed Carol alimony, the court considered:

> [T]he financial condition and needs of [Carol], [her] earning capacity or ability to produce income, including the impact of diminished workplace experience resulting from primarily caring for the children, the length of the marriage, whether [she] has custody of the minor children requiring support, and whether [she] directly contributed to any increase in [Joseph's] skill by enabling [him] to attend school during the marriage.

The court found each factor supported an award of alimony. The court also noted "there was credible evidence that [Joseph] knowingly and intentionally caused physical harm to [Carol] and [Joseph] substantially undermined the financial stability of" the family, which the court said further supported the alimony award. Because the court imputed a monthly income of $3,421 to Joseph, after subtracting what it deemed his reasonable monthly expenses, the court determined he had an excess of $446 per month.

¶21    Using the budgets the court set and the parties' imputed income, the court determined Joseph had an unpaid alimony obligation of $5,580, to be deducted from his share of the proceeds generated from the sale of their house, a marital asset. The court also determined Joseph's ongoing alimony obligation to Carol would be $86 per month to account for her shortfall.

*Property Distribution*

¶22    Joseph and Carol had a marital home that they sold before the divorce for $205,374.05, the proceeds of which were kept in a trust account. The district court began the property division by allocating half of the proceeds to each party. It then determined the value of certain items of disputed property and to whom the items should be awarded. As it did this, the court gave the non-receiving party an offset from the recipient's house proceeds. For example, Carol was awarded a grand piano,

valued at $11,907, and Joseph was thus awarded a $5,953.50 offset from Carol's share of the house proceeds. The court used this same method to divide the marital debts and to reimburse Carol for half of the children's medical, dental, and orthodontic bills she had incurred on her own. Because the court found Joseph owed Carol unpaid child support and unpaid alimony, those amounts also were deducted from his share of the house proceeds. In addition to his student loan debt, Joseph was deemed solely responsible for the $16,500 loan from his father and $4,000 he had charged on the joint credit card for attorney fees related to his criminal case. The court divided the remaining debts equally.

ISSUES AND STANDARDS OF REVIEW

¶23    Joseph raises five issues on appeal. First, he claims the district court's imputation of his income to calculate his child support and alimony obligations was in error because the court failed to apply the statutory guidelines. "We review the [district] court's interpretation of statutory requirements for correctness." *Busche v. Busche*, 2012 UT App 16, ¶ 7, 272 P.3d 748. The court's ultimate imputation of income is reviewed for abuse of discretion. *Pulham v. Kirsling*, 2019 UT 18, ¶ 41, 443 P.3d 1217.

¶24    Second, Joseph contends the district court erred when it calculated his child support obligation and found he owed unpaid child support. "Because [district] courts have broad discretion to award child support, we will not disturb such decisions absent an abuse of discretion." *Reller v. Argenziano*, 2015 UT App 241, ¶ 15, 360 P.3d 768 (quotation simplified).

¶25    Third, Joseph contends the district court erred when it determined the majority of his student loan debt to be his separate obligation. "There is no fixed formula for determining the division of debts in a divorce action. We require only that the district court's allocation of debt be based on adequate factual

findings. And we will not disturb those findings absent an abuse of discretion." *Dahl v. Dahl*, 2015 UT 79, ¶ 139 (quotation simplified).[5]

¶26    Fourth, Joseph alleges the district court erred when it set his budget for the alimony calculation. District "courts have considerable discretion in determining alimony and determinations of alimony will be upheld on appeal unless a clear and prejudicial abuse of discretion is demonstrated." *Osborne v. Osborne*, 2016 UT App 29, ¶ 25, 367 P.3d 1036 (quotation simplified).

¶27    Finally, Joseph claims the district court's overall distribution of property is inequitable. District courts have "considerable discretion" in this area as well, and we will uphold the district court's decision concerning property distribution "unless a clear and prejudicial abuse of discretion is demonstrated." *Gerwe v. Gerwe*, 2018 UT App 75, ¶ 8, 424 P.3d 1113 (quotation simplified).

ANALYSIS

I. Income Imputation

¶28    Joseph contends the district court erred when it imputed his income, alleging the court did not follow Utah Code section 78B-12-203 regarding (1) gross annual income, (2) self-employment income, and (3) the factors for imputing income. Income may be imputed to a party if, "in contested cases, a hearing is held and the judge . . . enters findings of fact

---

5. Our practice is to provide a parallel citation to reported Utah appellate opinions. For reasons unknown, this opinion has not found its way into the Pacific Reporter, third series, in the four years since it was issued.

as to the evidentiary basis for the imputation." Utah Code Ann. § 78B-12-203(8)(a) (LexisNexis 2018).[6] Because the parties each wanted the other's income imputed, the district court heard evidence related to their incomes.

A.    Gross Annual Income

¶29    Utah Code section 78B-12-203 establishes the method by which district courts may impute gross income. Section 78B-12-203(5)(a) directs courts, "[w]hen possible," to compute income "on an annual basis and then recalculate[] to determine the average gross monthly income." As Joseph points out, "courts frequently average several years of income." (Citing *Taft v. Taft*, 2016 UT App 135, ¶ 17, 379 P.3d 890; *Tobler v. Tobler*, 2014 UT App 239, ¶¶ 8, 28, 337 P.3d 296; *Dobson v. Dobson*, 2012 UT App 373, ¶ 2, 294 P.3d 591.) He claims the court erred because it took his "few highest earnings months out of the last several years and made that the imputation number." (Quotation simplified.) But this does not necessarily constitute error. The statute says courts must compute an annual income *"when possible."* Utah Code Ann. § 78B-12-203(5)(a) (emphasis added). Because Joseph had not held a consistent job and failed to provide "copies of all of his financial accounts," proof of his current income being deposited, or his tax documents (even after the court requested them), it was well within the court's discretion, under the circumstances, to impute Joseph's income as it did, and doing so did not constitute a "misunderstanding or misapplication of the law." *Anderson v. Anderson*, 2018 UT App 19, ¶ 19, 414 P.3d 1069 (quotation simplified); *see also Dole v. Dole*,

---

6. Although this statute "addresses imputation for the purposes of child support, it is also relevant to imputation in the alimony context." *Fish v. Fish*, 2010 UT App 292, ¶ 14 n.5, 242 P.3d 787. Because the material provisions cited have not changed, we cite the current version of the Utah Code.

2018 UT App 195, ¶ 7, 437 P.3d 464 (upholding imputation when "the actual income of [a spouse] is impossible to determine due to [his or her] dishonesty to [the district court], to [his or her] unaccountable income, and to his [or her] failure and refusal to obtain traditional employment" (quotation simplified)). Thus, we do not disturb the court's imputation of Joseph's income by averaging his monthly income from owning his own business and performing contracting work.

B.    Self-Employment Income

¶30    Joseph next argues the district court failed to follow statutory procedures for imputing income for a self-employed individual. If a party is self-employed or operates his or her own business, Utah law directs courts to "subtract[] necessary expenses required for self-employment or business operation from gross receipts." Utah Code Ann. § 78B-12-203(4)(a). Joseph started his own business with a $16,500 loan and operated it for three months, during which time he recouped the investment but earned nothing more. When imputing his income, the district court divided $16,500 by three and determined Joseph was capable of earning $5,500 per month. Joseph argues this was in error because he "earned nothing" during that period after subtracting necessary business expenses, which he identified as a computer, scanner, insurance, and travel. But Joseph did not provide any evidence of business expenses, and the court recognized his history of being "secretive about his finances" and his lack of candor. The court merely used this figure as a "high water mark" as evidence of his "potential income." In these circumstances, the court's decision was not an abuse of discretion.

C.    Statutory Factors

¶31    Finally, Joseph asserts the district court failed to follow the factors identified in Utah Code section 78B-12-203(8)(b). A court may not impute income to a party in contested cases unless

"a hearing is held and the judge . . . enters findings of fact as to the evidentiary basis for the imputation." *Id.* § 78B-12-203(8)(a). The court "shall" base the imputation on ten factors, "to the extent known." *Id.* § 78B-12-203(8)(b). These factors are "(i) employment opportunities; (ii) work history; (iii) occupation qualifications; (iv) educational attainment; (v) literacy; (vi) age; (vii) health; (viii) criminal record; (ix) other employment barriers and background factors; and (x) prevailing earnings and job availability for persons of similar backgrounds in the community." *Id.*

¶32    Joseph claims the district court "failed to acknowledge the factors that are most important here," namely employment opportunities, work history, health, criminal record, other employment barriers and background factors, and prevailing earnings and job availability for persons of similar backgrounds in the community. But the record is clear that the court did consider these factors; the factors simply did not weigh in Joseph's favor. For instance, Joseph argues the court should have considered his learning disability and criminal record, which it did. The court found Joseph "still very employable even considering those obstacles" and pointed to Joseph's own testimony, which "emphasized his ability to work hard, long hours and across many fields of employment." Joseph did not provide support for his assertion that his class B misdemeanor was the reason he could not obtain more lucrative employment. The court also considered Joseph's work history. It noted his "choices of employment have been significantly different, without believable explanation, depending on if the parties were together or separated" and found that "his current and historical income during the parties' separation is a deliberate attempt to minimize his financial obligations." It also found it incredible that Joseph—an individual with a medical degree—was earning "barely more than minimum wage." Thus, the record shows the court considered the statutory factors, and the conclusions it

drew from its consideration of them were therefore well within its broad discretion.

## II. Child Support

¶33 Joseph next argues the district court erred when it (1) used the sole custody worksheet to calculate his child support obligation and (2) determined he owed Carol unpaid child support. For the reasons detailed below, these arguments fail.

### A. Sole Custody Worksheet

¶34 In Utah, "child support obligations are generally calculated using a worksheet in cases of joint physical custody. Moreover, for purposes of calculating child support, the designation of 'joint physical custody' or 'sole physical custody' is not as important as whether the custody arrangement exceeds the statutory threshold for joint physical custody." *Stephens v. Stephens*, 2018 UT App 196, ¶ 29, 437 P.3d 445 (quotation simplified). District courts are given broad discretion in decisions regarding child support. *Anderson v. Anderson*, 2018 UT App 19, ¶ 21, 414 P.3d 1069. If a court deviates from the statutory guidelines, it must make a finding that following them "would be unjust, inappropriate, or not in the best interest of a child." *Gore v. Grant*, 2015 UT App 113, ¶ 13, 349 P.3d 779 (quotation simplified).

¶35 The district court noted Carol and Joseph had agreed upon joint physical custody, but it nevertheless used the sole custody worksheet to determine Joseph's child support obligation. The court supported its determination by making findings that Carol actually had the three eldest children overnight at her house for more than 70% of the time. Joseph's own testimony supports this determination: only the two youngest children spent a standard parent time schedule with him. Thus, Carol had sole physical custody—defined in terms of

overnights, *see* Utah Code Ann. § 78B-12-102(15) (LexisNexis 2018)—of three of the children, and the parties shared joint physical custody of two of the children. Under these unique circumstances, we see no abuse of discretion in the district court's decision to apply the sole custody worksheet.

B.     Unpaid Child Support

¶36     Joseph also claims the district court erred when it found he owed thirty-six months' worth of unpaid child support, based upon his imputed income, dating back to the filing of the divorce petition. He argues the court was without authority to ascribe unpaid support to him retroactively because Carol never asked the district court to enter a temporary order establishing the appropriate amount of child support to be paid during the pendency of the divorce case. But Joseph has not identified any statute or caselaw to support his position. *See Osborne v. Osborne*, 2016 UT App 29, ¶ 21, 367 P.3d 1036 ("Where the contentions on appeal are asserted without the support of legal reasoning or authority, this court will not assume the appellant's burden of argument and research." (quotation simplified)). Moreover, "child support is a basic and unalienable right vested in the minor," *Anderson*, 2018 UT App 19, ¶ 39 (quotation simplified), and "[e]very child is presumed to be in need of the support of the child's mother and father. Every mother and father shall support their children," Utah Code Ann. § 78B-12-105(1) (LexisNexis 2018). Joseph was aware of his duty to support his children, as evidenced by his $200 monthly payments to Carol. Simply because he chose an arbitrary—and low—amount does not absolve him of the responsibility to fully support his five children.

¶37     Because Joseph failed to point us to statutory or other authority to instruct us otherwise, we decline to conclude that the district court abused its discretion in awarding Carol unpaid

child support, dating back to the date the divorce petition was filed, even in the absence of a temporary order.

## III. Student Loans

¶38    Joseph challenges the district court's determination that the majority of the student loan debt was his separate obligation. "Neither spouse is personally liable for the separate debts, obligations, or liabilities of the other . . . contracted or incurred during the marriage, except family expenses." Utah Code Ann. § 30-2-5 (LexisNexis 2018). "There is no fixed formula for determining the division of debts in a divorce action. We require only that the district court's allocation of debt be based on adequate factual findings. And we will not disturb those findings absent an abuse of discretion." *Dahl v. Dahl*, 2015 UT 79, ¶ 139 (quotation simplified).

¶39    We see no abuse of discretion in the court's finding that, in these unique circumstances, the majority of the student loan debt should be considered Joseph's separate obligation. The court determined that Joseph alone had made the decision to "abandon his plans to be a licensed medical doctor" and that he should therefore be responsible for repaying the vast majority of the student loans associated with obtaining his medical degree. The court supported its conclusion by reviewing the parties' testimonies about the loans and determining Carol to be the most credible. "Credibility determinations are within the province of the [district] judge, who is uniquely equipped to make factual findings based exclusively on oral testimony due to his or her opportunity to view the witnesses firsthand, to assess their demeanor and to reconsider their testimonies in the context of the proceeding as a whole." *Kidd v. Kidd*, 2014 UT App 26, ¶ 34, 321 P.3d 200 (quotation simplified).

¶40    The court did not find Joseph's testimony about using approximately $200,000 of his student loans for family expenses credible. Joseph provided no evidence to support his claim,

other than two bank statements showing $3,308 was deposited into their joint account; the rest was kept in a separate account to which Carol had no access. Conversely, the court found Carol's testimony "about the resources she utilized from teaching piano lessons, welfare from the parties' church, family help and government assistance . . . credible and believable." The court also noted Joseph's testimony about "the extras that he needed in order to successfully complete medical school course work and the licensing tests," but indicated Joseph "did not acknowledge any were above and beyond the tuition amount." In these circumstances, the court's findings were not an abuse of its broad discretion.

## IV. Alimony

¶41 Joseph argues the budget the district court set for him in calculating his alimony was arbitrarily low, because it (1) failed to give him a line item for either his student loan debt or his current educational expenses, (2) failed to calculate his alimony obligation using the marital standard of living, and (3) supported its alimony award by finding Joseph at fault. District "courts have considerable discretion in determining alimony and determinations of alimony will be upheld on appeal unless a clear and prejudicial abuse of discretion is demonstrated." *Osborne v. Osborne*, 2016 UT App 29, ¶ 25, 367 P.3d 1036 (quotation simplified). Because we agree with Joseph that the district court should have given him a line item in his budget for either his student loan debt or tuition payments to keep the loan in deferral, we do not address the marital standard of living or fault arguments.

¶42 When deciding whether to award alimony, a district court must consider seven statutory factors, including "the ability of the payor spouse to provide support." Utah Code Ann. § 30-3-5(8)(a)(iii) (LexisNexis Supp. 2019). In determining Joseph's alimony obligation, the court took each party's

proposed monthly budget and adjusted it to remove discretionary expenses. It did not include a line item for Joseph's claimed $1,500 in educational expenses for himself. The court also declined to give him a line item for his student loan debt, because it was in deferment and he was not currently making payments on it. Although the court weighed statutory factors such as "the financial condition and needs of [Carol]; [her] earning capacity or ability to produce income, including the impact of diminished workplace experience resulting from primarily caring for the children, the length of the marriage, whether [Carol] ha[d] custody of the minor children requiring support, and whether [she] directly contributed to any increase in [Joseph's] skill by enabling [him] to attend school during the marriage," *see id.* § 30-3-5(8)(i), (ii), (iv), (v), (vii), the court failed to consider an additional mandatory factor, namely Joseph's ability to pay, *id.* § 30-3-5(8)(iii).

¶43 We conclude the court's failure to consider Joseph's ability to pay alimony was a "clear and prejudicial abuse of discretion." *Osborne*, 2016 UT App 29, ¶ 25 (quotation simplified). Because the district court found the majority of Joseph's student loan debt to be his sole obligation, it should have included a line item in his budget either for his student loan payments or for tuition payments that would keep the loan repayment in deferral. We acknowledge Joseph is not currently making student loan payments, but because he was found solely responsible for the loan debt and his share of the house proceeds are insufficient to pay off that debt, we cannot see on this record how he would not be entitled to a line item in his budget to account for either student loan payments or tuition payments.[7]

---

7. It is theoretically possible that Joseph could be the recipient of a scholarship or other financial aid that would allow him to attend school and thereby keep the student loan debt in deferment without actually making any out-of-pocket payment.

(continued…)

Although Joseph has a $446 excess in his court-determined budget, a line item for even half of his requested educational expenses would eliminate said excess. This would certainly affect his ability to pay the most modest alimony award. We therefore vacate the award of alimony.

## V. Property Distribution

¶44 Finally, Joseph argues the district court's overall property distribution was inequitable. "Generally, district courts have considerable discretion concerning property distribution in a divorce proceeding and their determinations enjoy a presumption of validity. Thus, we will uphold the decision of the district court on appeal unless a clear and prejudicial abuse of discretion is demonstrated." *Dahl v. Dahl*, 2015 UT 79, ¶ 119, (quotation simplified). Joseph contends he received "93% of the total debt [but only] 25% of the liquid assets." But as he points out, we cannot "consider[] the property division in a vacuum." (Quoting *Newmeyer v. Newmeyer*, 745 P.2d 1276, 1279 n.1 (Utah 1987).) Because the debt division Joseph cites includes both his student loan debt, the majority of which the court found was not marital debt, and the loan Joseph received from his father, which the court also found to be separate debt, the percentages he cites are artificially inflated. In reality, the court split the marital debts

---

(…continued)
But there was no such evidence presented at trial, and the district court made no findings to this effect. Joseph's testimony that he paid $1,500 per month to finance his current education stands unrefuted. And such a situation would in any event be relatively temporary; at some point in the near future, Joseph will be compelled to begin making payments on $260,000 of student loan debt that the district court assigned solely to him. Some provision must be made in Joseph's budget to account for this expense.

equally and did the same with the house proceeds. This does not constitute "a clear and prejudicial abuse of discretion." *Dahl*, 2015 UT 79, ¶ 119 (quotation simplified).

CONCLUSION

¶45 Because the district court did not exceed its considerable discretion in imputing Joseph's income, calculating child support, finding the student loans to be separate debt, and in its overall property distribution, we affirm its decisions on those points. But we vacate the modest alimony award because Joseph does not have the ability to pay it in light of his student loan debt.

———————