# THE UTAH COURT OF APPEALS

DUANE CROFT KNOWLES,
Appellant,
*v.*
CELIA FERN KNOWLES,
Appellee.

Opinion
No. 20200032
Filed April 7, 2022

Second District Court, Farmington Department
The Honorable David R. Hamilton
No. 174700123

Julie J. Nelson and Alexandra Mareschal, Attorneys
for Appellant

Emily Adams and Sara Pfrommer, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES RYAN M. HARRIS and DIANA HAGEN concurred.

CHRISTIANSEN FORSTER, Judge:

¶1      In 2016, Duane Croft Knowles and Celia Fern Knowles separated after nearly thirty years of marriage. During their separation, the district court awarded Celia[1] temporary alimony and, after a bench trial, entered a final alimony award. Duane now appeals those awards, arguing the court abused its discretion in (1) declining to award him credit for purported overages he paid in temporary alimony, (2) calculating the

---

1. Because the parties share the same last name, we refer to each by their first name, with no disrespect intended by the apparent informality.

parties' expenses in determining the final alimony award, and (3) selecting the date to value the retirement accounts. We affirm in part and reverse in part and remand.

BACKGROUND[2]

¶2     Duane and Celia were married in December 1989. They remained married for twenty-nine years, during which time they had six children. For the duration of the marriage, Duane worked as an optometrist and supported the family financially.

¶3     In 2016, Duane and Celia separated. At that time, only two of the children were minors.[3] Upon the parties' separation, Celia remained in the marital home, which was paid off. Each month Duane used his income to pay the family's bills and any remaining funds were then divided between the parties; in the initial months following their separation, Celia received $200 more per month than Duane, after which the excess was split 50/50. After several months of this informal arrangement, both parties filed motions for temporary orders, supported by financial declarations.

_____

2. "On appeal from a bench trial, we view the evidence in a light most favorable to the district court's findings, and therefore recite the facts consistent with that standard and present conflicting evidence to the extent necessary to clarify the issues raised on appeal." *Burggraaf v. Burggraaf*, 2019 UT App 195, n.2, 455 P.3d 1071 (quotation simplified).

3. At the time of the separation, Celia was awarded primary physical custody of the two minor children. In the final divorce decree, Duane and Celia were "awarded joint legal and joint physical custody" of the minor children. Neither custody nor child support is at issue in this appeal.

¶4  In Celia's financial declaration, she reported a nominal monthly income of $103.52 from her massage therapist side business but requested the court impute the minimum wage for full-time employment to her in the amount of $1,257 per month. Celia also declared that her monthly financial needs were $8,476.91. This total included, among other things, orthodontic expenses for one of the parties' minor children and a monthly donation for tithing to Celia's church.

¶5  In Duane's financial declaration, he reported a net monthly income of $9,671.08 from his job as an optometrist. Duane calculated his monthly expenses as $5,054.70 and included in those expenses a line-item for a tithing donation to his church.

¶6  The competing motions for temporary orders were reviewed before a commissioner in September 2017. Duane was ordered to pay Celia $3,797 in alimony each month, beginning in July 2017. The commissioner noted that "the issue of retroactive alimony prior to July 1, 2017," would be "reserve[d]" and that Duane "shall receive credit for amounts he has paid [Celia] or on behalf of [Celia] during this time." In calculating temporary alimony, the commissioner adjusted the stated monthly expenses for both parties, including eliminating the claimed monthly expense for tithing. The commissioner did not exclude, however, Celia's claimed orthodontic expenses for the parties' minor children.

¶7  Duane objected to the commissioner's alimony recommendations, arguing that the commissioner had improperly calculated the parties' needs by failing to "equalize the parties['] standards of living" and "by failing to consider the parties['] historical standard of living." In addition, he argued that the temporary award should cover only the actual expenses of the parties and not "projected expenses" such as possible

orthodontics for the parties' ten-year-old child who did not yet have braces.

¶8     Following briefing and argument on Duane's motion, the district court sustained the commissioner's recommendations as to the parties' temporary expenses and incomes. In particular, the court noted that including the orthodontic expenses in calculating Celia's needs "was not erroneous" because "[e]ven if orthodonti[cs] is not presently involved, it could occur in the immediate future." However, the court agreed with Duane that some of Celia's expenses were inflated and that alimony should be adjusted accordingly. The court then reduced the temporary alimony award from $3,797 to $2,809, with payments set to begin on July 1, 2017, the same day set by the commissioner in his initial order.[4]

¶9     In 2019, two years after Duane filed for divorce, the parties went to trial. During the course of the two-day bench trial on financial issues, both parties testified, along with their respective experts.

¶10    Duane first challenged the district court's award of temporary alimony, arguing that Celia's financial declarations were not adequately supported and that she had failed to prove the marital standard of living and her actual needs. In support of this argument, Duane called as an expert a forensic accountant to testify regarding the parties' marital standard of living. The expert first testified that prior to the parties' separation in 2016, the monthly marital expenses for both parties together were $9,338, or $4,669 each. He then explained that Celia had requested $8,476.91 in her financial declaration but had been

---

4. Following this ruling, Duane filed with this court a Petition for Permission to File an Interlocutory Appeal. The Petition was denied.

spending only around $4,755.02 per month. He also opined that, based on the parties' historical spending, tithing donations to their church were part of the marital standard of living.

¶11    In addition to challenging the amount of alimony, Duane asked the court to credit him $64,000 for what he characterized as an "overage" he paid in temporary alimony. In essence, Duane argued that the temporary alimony figure he had paid for approximately two years had been too high and asked the court to adjust that figure retroactively and award him the difference between what he had paid and what he should have paid. He argued that Celia had "intentionally dissipated the marital estate by overspending," "over-inflat[ing] her needs," and "refusing to work" despite having "the ability to work full time."

¶12    Following trial, the district court entered its findings of fact and conclusions of law. Based on its analysis of the parties' income and needs, the court awarded Celia $2,770 in permanent alimony per month moving forward.

¶13    In reaching that amount, the court first analyzed each party's income. It calculated Duane's monthly net income at $9,368, after averaging the prior four years of his annual income as stated in his tax returns. The court also imputed a monthly net income of $1,874 to Celia, finding that "she is voluntarily underemployed" and "capable of employment."

¶14    The court then analyzed the needs of each party. It first declined to "award any donations or tithing for either party." It reasoned that the tithing payments were "a religious preference" and "not a necessary living expense."

¶15    Next, after examining Celia's multiple financial declarations and other relevant evidence, the district court found that her post-divorce living expenses would be $5,382 per month. To reach this amount, the court excluded some of Celia's claims for expenses, finding the supporting evidence "lacking,

remote in time[,] and remote in detail." But the court also added additional expenses for a future mortgage and for health insurance, which had not been included in Celia's financial declarations.

¶16   Finally, the court examined Duane's financial declarations and supporting evidence and determined that his monthly post-divorce living expenses, excluding child support, would be $5,833. In so doing, the court excluded only "the expense of donations," finding Duane's other expenses "to be appropriate."

¶17   After setting the amount of permanent alimony, the district court addressed both parties' claims regarding alimony arrears and overpayments. Without addressing the merits of the parties' arguments, the court summarily concluded that both parties had failed "to provide or to carry the weight of the evidence in their respective favor" and declined to credit Duane for any overpayments of temporary alimony.

¶18   With respect to the parties' retirement accounts, the court awarded each party "one-half of the value of the marital portion of the retirement accounts, . . . with a valuation date of August 2, 2019," the date on which the court announced its oral ruling.

¶19   Following the district court's oral ruling, Duane filed a document requesting further clarification on a number of issues, including, as relevant here, his taxpayer filing status and the valuation date of the retirement accounts. As to his taxpayer filing status, Duane noted that his "ability to pay should be reduced by $224/month as his taxable income will be higher" because of the change in his filing status following the divorce. As to the valuation date of the retirement accounts, Duane noted that the division date "should be the date of separation" and not the date of divorce.

¶20   In response to Duane's request, the district court issued an order rejecting both arguments. First, it declined to change

Duane's taxpayer filing status, reasoning that Duane had not provided sufficient evidence to rebut its previous ruling. Second, it declined to change the valuation date of the retirement accounts. It acknowledged that "typically the date of division of retirement accounts is the date of divorce" but, due to the "totality of the circumstances" presented in this case, determined to use August 2, 2019 as the "date of division," noting that the parties had not made "sufficient argument about a different division date being used."

ISSUES AND STANDARDS OF REVIEW

¶21　Duane now appeals and raises three issues for our consideration. First, he contends that the district court erred "by failing to correct for overage paid in temporary alimony." "District courts have considerable discretion in determining alimony and determinations of alimony will be upheld on appeal unless a clear and prejudicial abuse of discretion is demonstrated." *Burggraaf v. Burggraaf*, 2019 UT App 195, ¶ 26, 455 P.3d 1071 (quotation simplified).

¶22　Second, Duane contends that the district court erred in calculating the amount of the permanent alimony award. Specifically, he argues that the court miscalculated the parties' expenses by failing to include the tithing contribution each paid to their church, by "including an ongoing expense for orthodonti[cs]," and by "miscalculating [Duane's] tax obligation." We review a district court's alimony determination for an abuse of discretion. *See id.* In determining alimony, a court exceeds its discretion if its alimony award "lacks a reasonable basis." *Redden v. Redden*, 2020 UT App 22, ¶ 15, 461 P.3d 314.

¶23　Third, Duane contends that the district court erred by "setting an arbitrary valuation date for the retirement accounts rather than the date of separation." "The [district] court in a divorce action is permitted considerable discretion in adjusting

the financial and property interests of the parties, and its actions are entitled to a presumption of validity." *Rayner v. Rayner*, 2013 UT App 269, ¶ 4, 316 P.3d 455 (quotation simplified). "Thus, we will not disturb a court's distribution of marital property unless it is clearly unjust or a clear abuse of discretion." *Goggin v. Goggin*, 2013 UT 16, ¶ 44, 299 P.3d 1079 (quotation simplified).

## ANALYSIS

### I. Overpayment of Temporary Alimony

¶24 Duane first contends that the district court abused its discretion by failing to credit him for what he considers to have been excess payments made to Celia pursuant to the court's temporary alimony order. Duane argued below, and argues now on appeal, that the temporary alimony award was erroneous because Celia obtained it by submitting inflated and unjustified need claims that the district court rejected after hearing the evidence at trial. Specifically, he argues that the temporary award underestimated the amount of income to be imputed to Celia, relied on an inflated estimate of Celia's needs, and included a triple award for the children's medical expenses.

¶25 Celia first responds that Duane failed to preserve this issue below, with the exception of his claim regarding the triple award of medical expenses. She then asserts that Duane's argument fails on the merits because his comparison of the temporary and final awards fails to account for changes in her circumstances during the two-year period between separation and trial. We turn first to the preservation argument and then address the merits.

### A. Preservation

¶26 Celia asserts that Duane's overpayment argument regarding her expenses and income is unpreserved because the

argument Duane raised in the district court is based on an "entirely distinct legal theory" from the argument he raises on appeal. (Quotation simplified.) In the district court, Duane argued that he paid too much in temporary alimony because Celia had "dissipated the marital estate by overspending" and had refused to work. Celia asserts these arguments are distinct from the argument Duane raises here, which is that the temporary alimony award was overinflated because of adjustments to Celia's alimony award made by the district court at the time of trial. We disagree with Celia's characterization of the arguments and conclude that the issue was properly preserved.

¶27   "Our preservation requirement is well-settled: we require parties to have raised and argued before the district court the issue that they raise and argue before us on appeal, and if a party does not, it has failed to preserve the issue." *True v. Utah Dep't of Transportation*, 2018 UT App 86, ¶ 23, 427 P.3d 338 (quotation simplified). "An issue is preserved for appeal when it has been presented to the district court in such a way that the court has an opportunity to rule on it." *State v. Rogers*, 2020 UT App 78, ¶ 20, 467 P.3d 880 (quotation simplified). A party asserting error on appeal must have raised the issue before the district court "specifically, in a timely manner, and with support by evidence and relevant legal authority." *True*, 2018 UT App 86, ¶ 24. "New arguments, when brought under a properly preserved issue or theory," may be properly considered on appeal. *Id.* ¶ 32 (quotation simplified). "Such arguments include citing new authority or cases supporting an issue that was properly preserved." *State v. Johnson*, 2017 UT 76, ¶ 14 n.2, 416 P.3d 443.

¶28   The arguments Duane raised repeatedly in the district court are, in fact, based on the same facts and legal theories as those he raises here. In the proceedings on temporary orders, Celia filed a financial declaration stating that her monthly need

was $8,476.91, which was only $1,000 short of Duane's entire net income. At that time, Celia was working a de minimis amount and had no expenses for health insurance or housing since she was residing in the paid-off marital home and receiving health insurance through Duane's employment. The commissioner reduced some of Celia's claimed expenses and imputed income to her based on full-time work at a minimum wage income and then recommended that Duane pay temporary alimony in the amount of $3,797 per month.

¶29    Duane objected to the commissioner's recommendation, arguing that Celia's requested amount far exceeded the marital standard of living. Duane requested that the district court immediately correct the inflated temporary alimony because he was concerned that the court would decline to correct it retroactively. The court agreed that some of Celia's expenses were inflated and reduced the temporary award to $2,809. Dissatisfied with the court's resolution of the issue, Duane filed a petition for interlocutory appeal with this court, again making the argument that the temporary alimony award was excessive because Celia's claimed expenses were excessive. His petition was denied.

¶30    Having been only partially successful in urging the district court to reduce the temporary award before trial, Duane again challenged the temporary award at trial. Indeed, Duane maintains that much of his motivation to take the case to trial—rather than to settle out of court—was to have the temporary alimony award corrected. Duane filed a trial brief in which he argued that he should be credited for any overage he had paid in temporary alimony and that temporary alimony should be "reduced retroactively as it was incorrectly applied." Specifically, Duane argued that Celia had "over-inflated her needs" and "misled the [c]ourt with her financial declaration." After the district court announced its preliminary oral ruling, Duane argued in post-trial briefing that the court should award

him a judgment for "alimony that was over-paid during the temporary orders." And at oral argument on the post-trial issues, Duane again argued that "[t]he temporary order created a substantial inequity between the parties" and that he should be given a judgment for the amounts he overpaid. The court noted Duane's argument but declined to analyze the merits of his arguments or credit him for any overpayment.

¶31 In short, Duane repeatedly argued below that the temporary alimony award was wrong for two broad reasons. First, he claimed that it was wrong due to Celia's allegedly overstated expenses. Second, he claimed that it was wrong due to Celia's allegedly understated earning capacity. Duane sought credit for these overages based on his argument that the evidence presented at trial failed to support the temporary award. This is the same argument that Duane advances here. The fact that Duane now illustrates the issue by pointing to the discrepancies between the temporary alimony order and the final alimony award (and noting the adjustments made to the final award to account for Celia's increased expenses for housing and health insurance) does not change the essence of Duane's argument. We therefore conclude that Duane adequately preserved the issue for our consideration.

B.    Temporary Awards

¶32 Utah Code section 30-3-3(3) authorizes an award of temporary alimony "to provide money, during the pendency of the action, for the separate support and maintenance of the other party and of any children in the custody of the other party." Utah Code Ann. § 30-3-3(3) (LexisNexis Supp. 2021). Although orders providing for temporary support are operative during the pendency of the divorce proceeding, they are not final orders from which an appeal of right may be taken. Rather, as interlocutory orders, they are subject to continuing review and modification by the district court until the issuance of a final

judgment. *See IHC Health Services, Inc. v. D & K Mgmt., Inc.*, 2008 UT 73, ¶ 27, 196 P.3d 588 (recognizing the broad discretion of district courts to reconsider and modify interlocutory rulings before final judgment).

¶33   Although district courts have discretion in fashioning temporary orders, temporary alimony is subject to the same requirements as a regular alimony award. *See Dahl v. Dahl*, 2015 UT 79, ¶¶ 85–98, 459 P.3d 276 (describing factors applied to temporary alimony and concluding the district court did not abuse its discretion in denying temporary alimony when wife failed to provide documentation of her needs). As is the case with awards of permanent alimony, temporary alimony awards must "follow[] logically from, and [be] supported by, the evidence." *Bakanowski v. Bakanowski*, 2003 UT App 357, ¶ 13, 80 P.3d 153 (quotation simplified).

¶34   Because of their nature, however, temporary awards are often based on limited evidence. Typically recommended by a domestic relations commissioner after a brief proffer hearing based largely on the financial declarations submitted by the parties, *see* Utah R. Jud. Admin. 6-401(2)(H), such temporary orders may result in awards that are not supported by the more substantial evidence presented at a later trial. For this reason, district courts have the authority to revisit temporary orders and, if warranted, retroactively modify them in the final divorce decree. *See* Utah Code Ann. § 30-3-3(4); *id.* § 30-3-5(4); *id.* § 78B-12-112(4) (2018); *Miner v. Miner*, 2021 UT App 77, ¶ 101, 496 P.3d 242; *McPherson v. McPherson*, 2011 UT App 382, ¶¶ 12, 17, 23, 265 P.3d 839.

¶35   This court's opinion in *McPherson* illustrates this point and is instructive here. There, husband appealed the district court's denial of his request for a retroactive modification of his temporary alimony obligation. *McPherson*, 2011 UT App 382, ¶ 10. The court had based its initial temporary award on the

recommendation of the domestic relations commissioner who, in turn, had based it on husband's salary at the time of the initial support hearing. *Id.* ¶¶ 3, 5. When the court entered the temporary award, it was unaware that husband had since been fired from his job. *Id.* ¶ 5. Husband thereafter moved to amend the temporary order to recalculate his child support and alimony obligations in accordance with his then-decreased salary. *Id.* ¶ 7. The court denied the motion, reasoning that husband's decreased salary was likely the result of his voluntary underemployment. *Id.* Following a bench trial, however, the court reversed course, finding that husband was not voluntarily underemployed. *Id.* ¶ 19. It therefore reduced husband's future support obligations. *Id.* But it nevertheless denied husband's request for a retroactive modification of his temporary support obligations, reasoning there was "no basis in law, fact, or equity to retroactively reduce the amounts." *Id.* (quotation simplified).

¶36 On appeal, this court reversed and remanded with instructions for the district court to modify the temporary alimony award retroactively. *Id.* ¶ 24. While recognizing the considerable discretion district courts possess in determining alimony, we emphasized that such awards must be supported by an explanation based on the evidence. *Id.* ¶ 23. Because the temporary alimony award was based on the erroneous assumption (later rejected by the district court) that husband was voluntarily underemployed, there was no justification for the higher award. *Id.* ¶ 21. This court held that the district court abused its discretion by failing to retroactively modify husband's temporary support obligations, reasoning that "[e]ven if the commissioner's recommendations seemed well founded at the time of the hearings, once the premise of that decision was proved inaccurate, there was no reasoned basis to impose temporary support obligations that were mathematically impossible for [h]usband to pay." *Id.* ¶ 23.

¶37    Like the husband in *McPherson*, Duane argues the district court abused its discretion when it failed to credit him for temporary alimony payments that were higher than the amount the court determined was appropriate after hearing the evidence at trial. We therefore consider whether the district court's refusal to modify the temporary alimony award was supported by its factual findings and rulings at trial.

¶38    Duane identifies $62,627 in alleged discrepancies between the district court's award of permanent alimony based on the trial evidence and its award of temporary alimony based on the proceedings before the commissioner. These consist of discrepancies between (1) Celia's imputed income ($16,255 in overage); (2) Celia's needs ($38,250 in overage); and (3) the amount awarded for medical expenses ($8,152 in overage). While Celia argues that these discrepancies are readily explainable, the district court offered no such explanation. Despite Duane's request for reimbursement of what he argued was excessive temporary alimony, the court summarily declined to reconcile the differences, stating only that "neither party submitted sufficient evidence for arrears or overages." But the district court's summary refusal to consider the merits of the issue on the basis of insufficient evidence does not suffice, because the evidence supporting Duane's request for reimbursement of asserted overages was the very same evidence that supported the court's award of permanent alimony.[5] Indeed, the court's explanation for its refusal to address the discrepancies between the temporary and final award is no more

---

5. Duane offered evidence at trial supporting the permanent alimony award. Because he proved his case at trial and identified relevant discrepancies between the temporary and final alimony awards, there was nothing else he needed to do (or could have done) to support his request for reconsideration of the temporary award.

sufficient than the *McPherson* court's conclusory statement that there was "no basis in law, fact, or equity to retroactively reduce the amounts." *See* 2011 UT App 382, ¶ 19 (quotation simplified). We therefore turn to the alleged discrepancies Duane identifies.

1.    Celia's Imputed Income

¶39    An alimony award must account for the ability of the recipient spouse to support themselves. *See* Utah Code Ann. § 30-3-5(9)(a)(ii) (LexisNexis Supp. 2021). At the temporary stage, the court imputed $1,225 in net income to Celia. But at trial, the court agreed with Duane and found that Celia was "voluntarily underemployed" and "capable of employment." Based on the testimony presented at trial, the court imputed to Celia $1,874 per month in net income, which represented an increase of $649 per month over the amount imputed in the temporary award. And the court made no finding suggesting that Celia could not have earned that amount during the pendency of the proceedings, or otherwise justifying the discrepancy between the temporary order and its findings at trial. The court should have considered whether Celia had the same earning capacity during the separation.

2.    Celia's Needs

¶40    An alimony award also must account for the financial condition and needs of the recipient spouse. *See id.* § 30-3-5(9)(a)(i). At the temporary stage, when Celia was residing in the paid-off marital home and receiving health insurance through Duane's employment, the court found that Celia had monthly expenses (needs) of $5,370. After imputing a monthly net minimum wage of $1,225 to Celia and giving Duane credit for $1,336 in monthly child support payments, the court entered a temporary alimony award of $2,809 per month.

¶41    At trial, however, the court found that evidentiary support for Celia's expenses was "lacking, remote in time,"

"remote in detail," and "artificial." It therefore disallowed many of her claimed expenses. It then added a monthly mortgage expense of $1,015 to account for the fact that Celia would be required to refinance the marital home to cash out Duane's equity. It also added a monthly health insurance expense of $503 because Celia would no longer be eligible for insurance through Duane's employer after the divorce. Following these adjustments, the court made a finding that Celia's monthly post-divorce expenses were $5,382. Excluding the post-divorce adjustments for housing and health insurance, the permanent award based on the trial evidence was $1,530 per month less than the temporary award or a total of $38,250 over the twenty-five months that Duane paid support pursuant to the temporary order. Duane argues that the district court erred in failing to award him this overage.

¶42   Celia argues that this court should reject Duane's argument because he failed to marshal the evidence supporting the district court's permanent award. She argues that Duane disregarded the evidence supporting her need for support after "the collapse of her 27-year marriage where she was largely a stay-at-home parent." But marshalling is not required, because Duane has not raised a sufficiency argument or challenged the district court's factual findings. And Celia has not explained why the length of the marriage or her status as a stay-at-home parent justifies the discrepancies in the amount of the temporary and final awards, since these issues are properly considered in determining the length of the alimony award and the level of income to impute to the receiving spouse. *See id.* § 30-3-5(9)(a)(ii), (iv).

¶43   Celia next argues that Duane is committing a logical fallacy of false equivalence by comparing the temporary and final alimony awards because there are significant differences between the two kinds of awards. She posits that a spouse's needs, ability to produce income, and support of minor children

may change from the time a court orders temporary alimony to the time of the final award and suggests that this is the explanation for the discrepancies here. She asserts that she was able to earn more income as time went on because her children were growing and their medical needs had decreased. She therefore suggests the district court determined she could earn more after the divorce was final than during its pendency. A court could conceivably find that a party is able to earn more at the time of trial than at the time of temporary orders. But the court made no such finding here, and we note that at no point during the temporary proceedings did Celia argue that the children's medical needs prevented her from working. Indeed, the commissioner imputed her minimum wage for full-time work, and the district court found that Celia was voluntarily underemployed and flatly rejected her argument that she could not work because of the children's medical needs.

¶44 Finally, Celia argues that Duane's line-by-line comparison of the temporary and permanent awards is misleading because an alimony award is based on a more generalized determination of the amount necessary for both parties to maintain the standard of living that they enjoyed prior to the divorce. Because the temporary award ($2,809) was only $39 higher than the final award ($2,770), Celia maintains that the court's failure to make an adjustment could not have been an abuse of discretion. But this argument ignores the adjustment made to the temporary award to account for mortgage and health insurance expenses.[6] And more importantly, it is at odds with the district court's express finding that evidentiary support for Celia's claimed

---

6. In fact, by comparing only the final amounts of the parties' expenses, without accounting for the changes in Celia's mortgage and insurance obligations, Celia engages in the same logical fallacy that she accuses Duane of making—the fallacy of false equivalence.

expenses was "lacking, remote in time," "remote in detail," and "artificial." The court should have considered the merits of Duane's arguments regarding these discrepancies to determine whether a modification of the temporary alimony award was in order.

### 3. Medical Expenses

¶45 Duane also argues that the temporary alimony award erroneously included a triple award of medical expenses. The temporary orders awarded Celia approximately $400 per month for medical expenses for the parties' children, as well as half the funds in the parties' health savings account (HSA). In addition, the temporary orders required that Duane pay for half the children's medical costs. Duane reasons that Celia should not have been awarded the $400 per month for medical expenses and half of the HSA account, because he was already required to pay for half of the children's medical costs. And he argues this inequity was exacerbated at trial when the court awarded Celia an additional lump sum for orthodontic expenses and miscellaneous out-of-pocket medical expenses. Duane seeks a credit in the total amount of $8,152.

¶46 Celia disputes Duane's claim, arguing that Duane has failed to demonstrate that the money she was awarded for medical expenses exceeded the actual needs of the family. She also points to the district court's finding that she had established the amount of the medical expenses with receipts and testimony not refuted by Duane, and that the award was to be paid from the HSA, not in addition to it.

¶47 Duane responds that Celia is confusing the district court's award for medical expense arrearages with the ongoing expenses included in calculating Celia's need. He explains the court included approximately $400 per month in medical expenses in calculating Celia's expenses, awarded Celia half the HSA account, and then duplicatively ordered Duane to pay for

half the children's medical expenses during the temporary orders period. After trial, Celia was awarded $150 per month in health care expenses and Duane was awarded the entire HSA amount. As was the case with Duane's claim to recover overages associated with Celia's allegedly inflated expenses and underemployment, the district court did not engage with Duane's arguments that the temporary alimony award was $541 too high, stating only that it "had previously ruled that [Celia] is entitled to an award of medical expenses" and that it would "not modify its previous ruling." There was no legal justification for the court's refusal to examine the merits of Duane's claim.

4.      Remand

¶48    Temporary support orders are interlocutory in nature and therefore subject to continuing modification by the district court through the date of the final decree. Because they are often based on proffers that may differ from the actual evidence presented at trial, such temporary orders may result in awards that are not supported by the evidence presented at a later trial. For this reason, district courts have not only the authority, but the obligation, to revisit temporary orders when requested and, if warranted, to "true-up" or retroactively modify them to comport with the evidence.

¶49    While district courts retain broad discretion in fashioning support orders in divorce proceedings, they are obligated to analyze a timely claim by a party seeking to true-up a temporary support order with the evidence received at trial. This true-up process consists of a two-part exercise. If a true-up is timely requested, the court should first make factual findings relevant to the temporary award to determine whether it was supported by the evidence. If the court finds, after hearing all the evidence presented at trial, that the temporary order was inappropriate, then the court should proceed to the second step: determining whether a true-up is warranted in the case at hand. In many

cases, a party who has demonstrated that a temporary order was inappropriate and unsupported by the more comprehensive evidence presented at trial will be entitled to a retroactive modification of that order. *See McPherson v. McPherson*, 2011 UT App 382, ¶¶ 21–24, 265 P.3d 839. But in some cases, a court may find that such retroactive modification is inappropriate or inequitable, notwithstanding an inaccuracy or error in the temporary order. In making the determination whether to order a true-up, a court should identify the considerations bearing on its decision and should enter careful findings explaining the basis for that determination.

¶50   Here, Duane was entitled to have the district court engage on the merits in determining whether he was entitled to a true-up. As we have discussed, Duane repeatedly asked the district court to consider his contention that the temporary alimony award was too high and timely sought an offset based on the evidence presented at trial. At trial, the court concluded that Celia should be imputed more income than was included in calculating the temporary alimony. It also found that Celia's claimed expenses were lacking in evidentiary support. But it failed to analyze, explain, or reconcile the discrepancies between the numbers used to calculate the temporary and final alimony orders. It similarly failed to engage in or analyze Duane's claim that both the temporary and final alimony orders had duplicated the award for the children's medical expenses. This was an abuse of its discretion. We therefore remand the matter to the district court to complete the first step of the true-up process by making appropriate factual findings relevant to the temporary award to determine whether it was supported by the evidence. If the court finds the temporary order was overinflated, it must then determine whether a true-up is warranted. And it should also consider Duane's claim that both the temporary and final alimony awards included a triple award of the children's medical expenses.

## II. Calculation of the Final Alimony Award

¶51 Duane next contends that the district court erred, in three ways, in calculating the final alimony award: (1) it did not consider tithing paid to the parties' church as consistent with the marital standard of living, (2) it failed to consider Duane's post-divorce tax bracket, and (3) it included orthodontics as a permanent expense. We address each argument in turn.

### A. Tithing

¶52 Duane argues that the district court miscalculated his ability to pay alimony by excluding expenses that it deemed unnecessary. According to Duane, the court analyzed whether the parties' claimed expenses were "necessary," rather than whether they were consistent with the "marital standard of living." (Quotation simplified.) After doing so, it determined that tithing paid to the parties' church was not a necessary obligation and therefore excluded it from Duane's list of expenses, thus inaccurately increasing his ability to pay.

¶53 When setting an alimony award, the district court must consider a number of statutory factors, including "the financial condition and needs of the recipient spouse," "the recipient's earning capacity or ability to produce income," and "the ability of the payor spouse to provide support." Utah Code Ann. § 30-3-5(9) (LexisNexis Supp. 2021). "Furthermore, the award should advance, as much as possible, the purposes of alimony by assisting the parties in achieving the same standard of living they enjoyed during the marriage, equalizing the parties' respective standards of living, and preventing either spouse from becoming a public charge." *Hansen v. Hansen*, 2014 UT App 96, ¶ 6, 325 P.3d 864 (quotation simplified).

¶54 In adhering to these principles, this court has described the proper process to be followed by courts when awarding alimony:

> First, the court must assess the needs of the parties, in light of their marital standard of living. Next, the court must determine whether the receiving spouse is able to meet [their] own needs with [their] own income. If the court finds that the receiving spouse is unable to meet [their] own needs with [their] own income, the court must then assess whether the payor spouse's income, after meeting [their own] needs, is sufficient to make up some or all of the shortfall between the receiving spouse's needs and income.

*Redden v. Redden*, 2020 UT App 22, ¶ 21, 461 P.3d 314 (quotation simplified). If the court determines after conducting this analysis "that there are insufficient resources to meet the baseline needs established by the marital living standard, the court should then equitably allocate the burden of the shortfall between the parties." *Rule v. Rule*, 2017 UT App 137, ¶ 22, 402 P.3d 153.

¶55 As an initial matter, the court must assess the needs of the parties not by applying its own sense of which expenses are truly necessary but, instead, by examining whether their claimed expenses are consistent with the standard of living the parties established during the marriage. *See id.* ¶ 15. This assessment is fact-sensitive and individualized and must be limited to a determination of whether the claimed needs are "based on the parties' historical standard of living." *See Bakanowski v. Bakanowski*, 2003 UT App 357, ¶ 12, 80 P.3d 153; *see also Anderson v. Anderson*, 2018 UT App 19, ¶ 31, 414 P.3d 1069 (defining "standard of living as a minimum of necessities, comforts, or luxuries that is essential to maintaining a person in customary or proper status or circumstances" and "disavow[ing] the notion that standard of living is determined by actual expenses alone" (quotation simplified)). Indeed, it is not the job of the district court to "appl[y] its own sense of what was reasonable under the

circumstances." *See Dobson v. Dobson*, 2012 UT App 373, ¶ 29, 294 P.3d 591.

¶56 In comporting with this principle, this court has upheld alimony awards that included unique expenses—even expenses some observers might deem frivolous or unnecessary—where such expenses were consistent with the marital standard of living. *See, e.g.*, *Miner v. Miner*, 2021 UT App 77, ¶¶ 22, 26, 44, 496 P.3d 242 (awarding receiving spouse, among other things, $1,000 per month for "tennis-related expenses," $625 per month for "entertainment," and $5,000 per month for horse care and maintenance where each expense was a historical marital expense supported by the evidence). Moreover, courts may infer that "the parties' current expenses were based on the marital standard of living when the majority of the expenses in the [payor spouse's] current financial declaration are identical in amount to those identified as marital expenses in the [receiving spouse's] current financial declaration." *Eberhard v. Eberhard*, 2019 UT App 114, ¶ 48, 449 P.3d 202 (quotation simplified); *see id.* (finding that receiving spouse's request for $300 per month for donations and gifts was reasonable "[i]n light of the fact that the court allocated the same amount for each party to spend on donations and gifts"). Accordingly, as long as a party's claimed expenses are consistent with the marital standard of living, are based on sufficient factual findings, and advance, as much as possible, the purposes of alimony, such expenses should be included in the "needs" calculation.

¶57 The district court did not follow this process here, however. In setting the alimony award, the court did not analyze whether the parties' tithing payments were an expenditure consistent with the marital standard of living. Instead, the court declined to "award any donations or tithing for either party" based on its finding that "tithing is a donation and . . . not a necessary living expense." We agree with Duane that in so doing, the court eliminated the expense based on a subjective

needs judgment that ignored the requirement that it assess the expense based on how the parties chose to spend and allocate their money while married. *See Bakanowski*, 2003 UT App 357, ¶ 12. And here, the parties presented evidence that their historical standard of living consistently included paying tithing to their church.[7] By failing to assess whether the parties' expenditures were consistent with the marital standard of living, the court abused its discretion. Accordingly, we reverse the court's determination on this point and remand for the court to reassess the tithing expense following the process detailed above. The court should make a finding as to whether tithing was included in the parties' marital standard of living and, if it was, should account for that expense in calculating alimony.[8] If inclusion of tithing in the calculation results in a shortfall, the shortfall should be equitably allocated between the parties.

---

7. Prior to trial, both parties listed tithing to their church as a monthly expense in their financial declarations. And at trial, both parties testified that after their separation they continued to pay tithing. Duane's accounting expert also testified that, based on the parties' historical spending, donations to their church were part of the parties' marital standard of living.

8. Our instruction should not be construed as a rigid rule requiring district courts to factor into every alimony determination all donations, charitable contributions, or the "need to fund post-divorce savings, investment, or retirement accounts." *See Bakanowski v. Bakanowski*, 2003 UT App 357, ¶ 16, 80 P.3d 153. The inclusion of such obligations as part of the needs analysis is discretionary after consideration of all relevant facts and equitable principles and is appropriate only in circumstances where such spending was "standard practice during the marriage and helped to form the couple's marital standard of living." *Id.*

B.   Tax Status

¶58   Duane next argues that the district court miscalculated his ability to pay because it failed to consider his post-divorce tax obligation. When awarding alimony, the district court must consider "the ability of the payor spouse to provide support," Utah Code Ann. § 30-3-5(9)(a)(iii) (LexisNexis Supp. 2021), which "includes consideration of the payor spouse's tax obligations," *McPherson v. McPherson*, 2011 UT App 382, ¶ 13, 265 P.3d 839.

¶59   The court calculated Duane's ability to pay by averaging "the last four years" of his net income as listed in his historical tax returns. Based on those returns, the court determined that Duane's tax obligation would be $24,335.77. In making this determination, the court failed to consider that during each of those years the parties' filing status was married filing jointly, but that after the divorce Duane's filing status would—at least for a time—be single or head of household, which would increase his tax obligation. Because the court failed to properly consider Duane's tax obligation, we reverse and remand for it to recalculate Duane's post-divorce tax obligations.

C.   Orthodontics

¶60   Duane next argues that the district court "mistakenly included $112 per month for orthodonti[cs] in the alimony award." He contends that this award is improper because (1) no evidence supported an orthodontics expense "that will endure for the entire . . . length of the alimony," (2) he already pre-paid orthodontics as part of temporary alimony, and (3) he was already ordered to pay half the children's medical expenses. As previously discussed, the temporary alimony award included $167 per month for orthodontic expenses for the parties' ten-year-old child who was not yet wearing braces. Duane sought an offset for this amount against the final alimony award and further argued that the alimony award for orthodontic expenses

was duplicative in light of the court's separate order that Duane pay half of the children's medical expenses. But the district court declined to address Duane's arguments. Because we have remanded these issues for further consideration, we need not resolve at this juncture Duane's claims regarding the orthodontics expenses. Rather, we direct the district court to re-examine the issue and articulate the factual and legal basis for its decision.[9]

### III. Valuation Date for the Retirement Accounts

¶61    Finally, Duane argues that the district court abused its discretion by assigning a valuation date to the parties' retirement accounts that was "long after the date of separation, yet not the date of divorce."

¶62    "Generally, the marital estate is valued at the time of the divorce decree or trial." *Jacobsen v. Jacobsen*, 2011 UT App 161, ¶ 39, 257 P.3d 478 (quotation simplified). However, "a court has broad discretion to value the parties' marital assets at a different time, such as that of separation, if it determines that the circumstances so warrant." *Petrzelka v. Goodwin*, 2020 UT App 34, ¶ 47, 461 P.3d 1134. "[A]ny deviation from the general rule must be supported by sufficiently detailed findings of fact that explain the [district] court's basis for such deviation." *Rappleye v. Rappleye*, 855 P.2d 260, 262 (Utah Ct. App. 1993).

¶63    In this case, the parties separated on May 24, 2016. In 2019, the matter proceeded to a multi-day bench trial that took

---

9. As part of its analysis, the district court should evaluate whether the expenses for the medical care of the parties' minor children are more appropriately addressed as alimony or child support. *See Dobson v. Dobson*, 2012 UT App 373, ¶ 11, 294 P.3d 591 (indicating the preference for separating child-related expenses from recipient-related expenses).

place between January and April. The court delivered its oral ruling on August 2, 2019. In that ruling, the court addressed the division of the parties' retirement accounts, ordering that they "be divided . . . 50/50 to each party, effective . . . today, . . . August the 2nd." Approximately four months later, on December 11, 2019, the court reduced its oral ruling to writing.

¶64     Duane contends that the valuation date set by the district court is "arbitrary" and not supported by sufficient findings. He maintains that the court should have set the valuation date as the date of separation. We disagree.

¶65     The valuation date was not arbitrary; it was in fact consistent with the general rule that "the marital estate is valued at the time of the divorce decree or trial." *See Jacobsen*, 2011 UT App 161, ¶ 39 (quotation simplified). Here, the court set the valuation date as August 2, 2019—the same date on which it delivered its oral ruling at the close of trial. Because the court followed the general rule of setting the valuation date at the time of trial, it was not required to articulate any additional findings of fact explaining its decision. *See id.*

¶66     Moreover, the district court was not presented with sufficient evidence to justify a departure from the general rule. After the court's oral ruling, Duane filed a motion to alter or amend arguing, among other things, that the date of separation should be used as the valuation date because Celia did not contribute to the retirement accounts during the period between the separation and the date of the divorce and therefore should not benefit from the increase in its value.

¶67     The court considered Duane's motion and issued an order upholding its choice of valuation date. It explained that "due to the totality of the circumstances a firm date of August 2nd, 2019 is the date of division of the retirement assets. The Court finds that there was not sufficient argument about a different division date being used." Given the lack of argument as to an alternative

valuation date, the court had no option other than to set the date as the date "of the divorce decree or trial." *See id.* (quotation simplified). Duane does not persuade us that the district court acted outside the bounds of its discretion in setting the valuation date for the retirement accounts.

CONCLUSION

¶68 The district court abused its discretion by failing to meaningfully address Duane's argument that based upon the court's own post-trial findings, he was entitled to an offset for overages paid in temporary alimony, including offsets arising from the amount of Celia's imputed income and inflated expenses. The district court similarly erred in failing to consider Duane's arguments regarding the award of medical expenses, including orthodontics. The district court also abused its discretion when calculating Duane's ability to pay permanent alimony by excluding tithing as part of the marital standard of living and by underestimating Duane's post-divorce tax obligation. But we affirm the court's valuation date for the parties' retirement accounts. We therefore reverse the district court's alimony award and remand the matter to the court for reconsideration of the alimony award in accordance with this opinion.

———————